**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SAYSINH P. KHIANTHALAT,

      Petitioner,

v.                                Case No. 8:13-cv-2702-T-36TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Petitioner Saysinh P. Khianthalat, an inmate in the Florida Department of Corrections proceeding *pro se*, filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254 (Dkt. 11).  He challenges his convictions entered by the Circuit Court for the Tenth Judicial Circuit, Polk County, Florida, in 2005.  Respondent filed a response (Dkt. 15), in which it concedes the petition's timeliness.  Khianthalat filed a reply (Dkt. 22) and notices of supplemental authority (Dkts. 23, 24).  Upon review, the petition must be denied.

**PROCEDURAL HISTORY**

The State charged Khianthalat with nine counts of lewd battery on a child 12 years of age or older but less than 16 years of age (counts one through nine), one count of solicitation to commit perjury in an official proceeding (count ten), and one count of tampering with a witness (count eleven).  (Dkt. 18, Ex. 1.)  The trial court granted judgments of acquittal on counts six, eight, and nine.  (Dkt. 18, Ex. 2, pp. 277, 282.)  A jury convicted Khianthalat of the remaining counts.  (Dkt. 18, Ex. 3.)

The trial court sentenced Khianthalat to an overall sentence of 45 years in prison. (Dkt. 18, Ex. 5, pp. 1-2.)  The Second District Court of Appeal affirmed the convictions and sentences in a written opinion.  *Khianthalat v. State*, 935 So.2d 583 (Fla. 2d DCA 2006). The Florida Supreme Court affirmed the decision of the Second District Court of Appeal in a written opinion.  *Khianthalat v. State*, 974 So.2d 359 (Fla. 2008).  The United States Supreme Court denied Khianthalat's petition for writ of certiorari.  (Dkt. 18, Ex. 7.)  The state appellate court denied Khianthalat's petition alleging ineffective assistance of appellate counsel.  (Dkt. 18, Exs. 9, 10.)

Subsequently, Khianthalat was resentenced as a result of a motion to correct illegal sentence.  The trial court sentenced Khianthalat to an overall term of 33 years in prison. (Dkt. 18, Ex. 12.) The Second District Court of Appeal *per curiam* affirmed this sentence. (Dkt. 18, Ex. 19.)

Khianthalat then filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850.  (Dkt. 18, Ex. 14.)  The state court summarily denied several claims, dismissed two claims with leave to amend, and directed the State to respond to the remaining claims.  (Dkt. 18, Ex. 15.)  After Khianthalat filed an amended petition and the State filed its response, the state court denied some of Khianthalat's claims but held an evidentiary hearing on his other claims.  (Dkt. 18, Exs. 16, 17.)  Following the evidentiary hearing, the state court entered a final order denying Khianthalat's postconviction motion. (Dkt. 18, Ex. 20.)  On appeal, Khianthalat raised one issue.  (Dkt. 18, Ex. 21.)  The Second District Court of Appeal *per curiam* affirmed the denial.  *Khianthalat v. State*, 140 So.3d 587 (Fla. 2d DCA 2013) (table).

## FACTUAL BACKGROUND[1]

Khianthalat's charges stem from his relationship with S.T.  Khianthalat was divorced from S.T.'s older sister but had regular contact with the sisters' family.  Khianthalat engaged in vaginal and oral sex with S.T. and digitally penetrated S.T.'s vagina.  These acts began to occur when S.T. was thirteen years old and continued when she was fourteen years old.

After S.T. and her mother approached law enforcement, Detectives Scott Kercher and Steven Richburg obtained a statement from S.T.  They next spoke to Khianthalat at his place of employment.  After some initial discussion, they began taping the interview. In his recorded statements, Khianthalat admitted to sexual activity with S.T.

Khianthalat was arrested at a later date.  Following his arrest, he called S.T. from jail.  This call was recorded.  Khianthalat told S.T. that at a trial, "all you have to do is say you made it all up."  He and S.T. discussed dropping the charges, but S.T. told him she could get in trouble for changing her statements.

At trial, Khianthalat denied sexual activity with S.T.  He testified that he only ever gave S.T. one "peck on the cheek."  Khianthalat further testified that he admitted to the sexual activity during his interview with police to tell the detectives what "they wanted to hear" so that he could return to work.

## STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Florida Dep't of Corr.,* 158 F.3d 1209, 1210 (11th Cir. 1998), *cert.*

---

[1] This factual summary is derived from the trial transcript and Khianthalat's appellate brief.

*denied,* 531 U.S. 840 (2000).  Habeas relief can only be granted if a petitioner is in custody

"in violation of the Constitution or laws or treaties of the United States."   28 U.S.C.

§ 2254(a).  Section 2254(d), which sets forth a highly deferential standard for federal court

review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this

deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal
> habeas court to grant a state prisoner's application for a writ of habeas
> corpus with respect to claims adjudicated on the merits in state court. Under
> § 2254(d)(1), the writ may issue only if one of the following two conditions is
> satisfied–the state-court adjudication resulted in a decision that (1) "was
> contrary to . . . clearly established Federal Law, as determined by the
> Supreme Court of the United States" or (2) "involved an unreasonable
> application of . . . clearly established Federal law, as determined by the
> Supreme Court of the United States." Under the "contrary to" clause, a
> federal habeas court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this Court on a question of law or if
> the state court decides a case differently than this Court has on a set of
> materially indistinguishable facts.  Under the "unreasonable application"
> clause, a federal habeas court may grant the writ if the state court identifies
> the correct governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established

federal law is objectively unreasonable . . . an unreasonable application is different from

an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that [the federal court is] to decide.").  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the case.  "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693.  In other words, "AEDPA prevents defendants–and federal courts–from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster,* 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

The state appellate court affirmed the rejection of Khianthalat's postconviction claims in a *per curiam* decision without a written opinion.  This decision warrants deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not

lessen the deference that it is due." *Wright v. Moore,* 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied,* 278 F.3d 1245 (2002), *cert. denied sub nom. Wright v. Crosby,* 538 U.S. 906 (2003). *See also Richter,* 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Review of the state court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, i.e., the record before the state court.

*Pinholster,* 563 U.S. at 181-82. Khianthalat bears the burden of overcoming by clear and convincing evidence a state court factual determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001).

## EXHAUSTION OF STATE COURT REMEDIES; PROCEDURAL DEFAULT

Before a district court can grant habeas relief to a state prisoner under § 2254, the petitioner must exhaust all state court remedies that are available for challenging his

conviction, either on direct appeal or in a state postconviction motion.   28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citations omitted).   A state prisoner "'must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at 845).

To exhaust a claim, a petitioner must make the state court aware of both the legal and factual bases for his claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).   A federal habeas petitioner "shall not be as the right under the law of the State to raise, by any available procedure, the question presented." *Pruitt*, 348 F.3d at 1358.  The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).  The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal

nature of the claim.   28 U.S.C. § 2254(b)(1);  *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established."  *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).  To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court."  *Wright v. Hopper*, 169 F. 3d 695, 703 (11th Cir. 1999). *See also Murray v. Carrier*, 477 U.S. 478 (1986).  To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions.  *United States v. Frady*, 456 U.S. 152, 170 (1982).  The petitioner must show at least a reasonable probability of a different outcome.  *Henderson*, 353 F.3d at 892;  *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

Alternatively, a petitioner may obtain federal habeas review of a procedurally defaulted claim if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000);  *Carrier*, 477 U.S. at 495-96.   A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995);  *Henderson*, 353 F.3d at 892.  This exception requires a petitioner's "actual" innocence.  *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001).  To meet this standard, a petitioner must show a reasonable likelihood of

acquittal absent the constitutional error.  *Schlup*, 513 U.S. at 327.

## DISCUSSION

**Procedural Default Of Ground One, Ground Two, And Ground Three Subclaims A And D Through I**

Khianthalat raised the arguments presented in Grounds One, Two, and Three, Subclaims A through I, in his state court postconviction motion.  With the exceptions of Grounds Three, Subclaims B and C, these arguments are unexhausted due to Khianthalat's failure to raise them on postconviction appeal.[2]

The state court denied Khianthalat's postconviction motion after conducting an evidentiary hearing on some claims.  Florida Rule of Appellate Procedure 9.141(b)(3) governs collateral proceedings when a motion has been granted or denied after an evidentiary hearing was held on one or more claims.  In *Cunningham v. State*, 131 So.3d 793 (Fla. 2d DCA 2012), addressing the application of this Rule, "Florida's Second District Court of Appeal clarified that [between December 2000 and September 2010], where the state post-conviction court had summarily denied some grounds, but denied others after an evidentiary hearing, the Second District would consider the merits, without briefing, of *all* grounds that the state post-conviction court had summarily denied." *Bucklon v. Sec'y, Dep't of Corr.*, 606 Fed. App'x 490, 492 (11th Cir. 2015) (emphasis in original).

However, the Second District Court of Appeal explained that it changed its policy so that as of October 2010 "[i]f any ground is resolved after an evidentiary hearing, we require the appellant to process the appeal under rule 9.141(b)(3)."  *Cunningham*, 131 So.3d at

---

[2] Ground Three, Subclaims J and K were not presented in Khianthalat's state postconviction motion. Therefore, they are procedurally defaulted for a different reason. The default is discussed in the analysis of Ground Three, Subclaims J and K, *infra*.

795. In Florida, an appellant is considered to have abandoned claims that were not briefed with specific argument. *Simmons v. State*, 934 So.2d 1100, 1111 n. 12 (Fla. 2006) (citing *Coolen v. State*, 696 So.2d 738, 742 n.2 (Fla. 1997)).

Because Khianthalat's collateral appeal was initiated in 2012, the Second District Court of Appeal treated it under the procedures set forth in *Cunningham*.  His failure to present these claims to the state appellate court results in a lack of exhaustion for purposes of federal habeas review.  Khianthalat cannot return to state court to file a successive, untimely postconviction appeal.  *See* Fla. R. App. P. 9.141.  Accordingly, these claims are procedurally defaulted.  *See Smith*, 256 F.3d at 1138.  Khianthalat does not establish that either the cause and prejudice or fundamental miscarriage of justice exception applies to overcome the default.  Notwithstanding the default based on his failure to exhaust the claims on collateral appeal, Khianthalat is not entitled to relief.

**Ground One: *Giglio* Violation**

Khianthalat alleges that the State violated *Giglio v. United States*, 405 U.S. 150 (1972) by eliciting false testimony from Detective Kercher concerning Khianthalat's interview.  Specifically, when the prosecutor asked Kercher whether the pre-tape discussion detailed the allegations, Kercher testified that he gave Khianthalat no specifics:

> Q.  And describe to the jury, when you arrived at [Khianthalat's] place of employment, what did you do first?
>
> A. [ ] I introduced myself.  Detective Richburg introduced himself.  We told him we had received a report down at the police department, and what it was about.  And it went from there.
>
> Q.  Did you give him any specific details or descriptions about what [S.T.] had told you and Detective Richburg?
>
> A.  Only by telling him that [S.T.] had made a report, along with her mother,

in reference to some sexual allegations that he may be involved in.

Q. Any more details that you provided to him, in terms of what [S.T.] had told you, or was it just what you just said?

A. Just that, no specifics.

(Dkt. 18, Ex. 2, p. 251.)

When the State re-called Kercher as a rebuttal witness, he testified:

Q. Did you ever tell [Khianthalat] what to say?

A. No.

Q. Did you ever recite every single word that [S.T.] told you, and then tell him - - for him to tell you that on tape?

A. No.

Q. Did he have any information, besides the bare minimums, from you about what it was that [S.T.] had told you?

A. No, just what I said we had talked about earlier.

(*Id.*, p. 342.)

Khianthalat alleges that, in fact, Kercher and Richburg discussed the specific allegations with him before beginning to record his statements.  Khianthalat asserts that he simply repeated this information back to the detectives because it was what they "wanted to hear."  (Dkt. 11, p. 7.)

The state court held an evidentiary hearing on this claim.  Khianthalat testified that, "There's a lot of stuff that was not in the transcripts" of the interview, but did not state what specific information detectives provided him before the interview.  (Dkt. 18, Ex. 18, p. 160.)  Kercher testified at the evidentiary hearing that he spoke only briefly with Khianthalat before starting the tape.  (*Id.*, p. 174-75.)  Richburg testified that he and Kercher did not tell

Khianthalat what S.T. said upon beginning the interview.  (*Id.*, pp. 187-88.)  After the evidentiary hearing, the state court rejected his claim, finding that, "[b]ased on a review of the testimony presented at the evidentiary hearing, the Court finds the Defendant has failed to establish any of the [*Giglio*] factors, much less all of them, and therefore Defendant's claim 1 is **DENIED**."  (Dkt. 18, Ex. 20, p. 230.)

The record supports the rejection of this claim.[3]  "To make out a valid *Giglio* claim, a petitioner 'must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment.'" *Ferguson v. Sec'y, Dep't of Corr.*, 580 F.3d 1183, 1208 (11th Cir. 2009) (quoting *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006)).

Khianthalat has not demonstrated that Kercher testified falsely.  Furthermore, even assuming Khianthalat had shown Kercher's testimony was untruthful, Khianthalat fails to demonstrate that the State knew this testimony to be false.  The prosecutor testified at Khianthalat's postconviction evidentiary hearing that he did not present false testimony and he had no knowledge of any false testimony by Kercher or any state witness.  (Dkt. 11, Ex. 18, p. 215.)  Khianthalat raises no challenge to the credibility of the prosecutor's evidentiary

---

[3] Khianthalat makes vague statements that Kercher gave him warnings that were inadequate under *Miranda v. Arizona*, 384 U.S. 436 (1966), asked if he wanted an attorney, and said his statements could not be used at a trial.  However, he does not clearly allege a *Giglio* violation in that Kercher provided false testimony about these matters either in the federal habeas petition or in his postconviction motion.  Moreover, even interpreting his claim as such, and notwithstanding the procedural default of Ground One, this allegation is meritless.  The record demonstrates that Kercher did not testify concerning *Miranda* warnings, whether Khianthalat was advised regarding an attorney, or whether he was informed his statements could not be used against him.  (Dkt. 18, Ex. 2, pp. 248-75, 341-43.)  Thus, Khianthalat does not demonstrate that Kercher gave false testimony about these topics and fails to establish a *Giglio* violation.  He does not show that the state court's rejection of this ground was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.

hearing testimony.

Furthermore, even assuming Khianthalat met the first prong of the test described in *Ferguson*, he fails to show materiality. Even if telling Khianthalat the details of S.T.'s allegations accounts for Khianthalat's ability to recite this information, it does not explain why he admitted to engaging in sexual activity with S.T. Thus, Khianthalat does not show any reasonable likelihood that the testimony in question affected the judgment. Because Khianthalat has not established any *Giglio* violation, Ground One warrants no relief.[4]

**Ground Two: *Brady* Violation**

Khianthalat claims that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) by withholding exculpatory information from the defense. As addressed, the argument presented in Ground Two is procedurally defaulted due to Khianthalat's failure to challenge the denial of this claim on postconviction appeal. Notwithstanding the default, Khianthalat shows no entitlement to relief.

**Subclaim A**

Khianthalat argues that the State violated *Brady* by failing to disclose that Kercher and Richburg provided him inadequate *Miranda* warnings at his interview. To establish a

---

[4] In its order rejecting Khianthalat's motion, the state court noted that, "Defendant testified that during his opening statement, [the prosecutor] made false statements regarding Defendant being advised of his right to counsel. The Court finds that an opening statement is not testimony. Furthermore, the claims alleged in the State's opening do not significantly deviate from the evidence presented at trial." (Dkt. 18, Ex. 20, p. 230.) To the extent that the court re-characterized his *Giglio* claim and did not address the specific *Giglio* claim Khianthalat raised in his postconviction motion and his federal habeas petition, he is not entitled to relief even under *de novo* review. *De novo* review is appropriate when a state court fails to address the merits of a claim presented in a habeas petition because 'the present controversy falls outside of § 2254(d)(1)'s requirement that [the federal court] defer to state court decisions that are not contrary to, or an unreasonable application of, clearly established federal law." *Davis v. Sec'y, Dep't of Corr.*, 341 F.3d 1310, 1313 (11th Cir. 2003). As addressed, however, Khianthalat fails to establish that Kercher's allegedly false testimony was material. Thus, he does not demonstrate any *Giglio* violation.

*Brady* violation, a petitioner must show that: "(1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either wilfully or inadvertently; and (3) the defendant incurred prejudice." *Wright v. Sec'y, Fla. Dep't of Corr.*, 761 F.3d 1256, 1278 (11th Cir. 2014). "A defendant cannot meet the second prong when, 'prior to trial, [he] had within [his] knowledge the information by which [he] could have ascertained the alleged *Brady* material.'" *Id.* (quoting *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir. 2005)).

The prejudice prong, "also referred to as the 'materiality prong,' is met when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). The inquiry asks "'whether the government's evidentiary suppressions, viewed cumulatively, undermine the confidence in the guilty verdict.'" *Id.* (quoting *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 746 (11th Cir. 2010)). This requires the court to "evaluate the effect of each suppressed item on its own and then weigh the cumulative impact of all the suppressed evidence." *Id.* (citing *Kyles*, 514 U.S. at 436 n.10).

Khianthalat does not establish that the State withheld any information about insufficient *Miranda* warnings.[5] Nor does he show that he could not have ascertained that the detectives allegedly failed to provide proper *Miranda* warnings. Not only was he present at the interview, but evidentiary hearing testimony reflects that Khianthalat and his attorney were provided a transcript of the interview that referenced pre-interview

---

[5] At the postconviction evidentiary hearing, Kercher and Richburg testified that they did not provide *Miranda* warnings because Khianthalat's interview was non-custodial. (Dkt. 18, Ex. 18, pp. 176, 185.)

discussions with the detectives.   (Dkt. 18, Ex. 18, pp. 163-64, 197.)  Finally, Khianthalat does not show that the allegedly withheld information was material such that there is a reasonable probability the result of the proceeding would have been different had it been disclosed.  As addressed in Ground Three, Subclaims B and C, *infra*, Khianthalat has not shown that his statement was subject to suppression based on involuntariness or a lack of *Miranda* warnings.  Moreover, even assuming that his statements were excluded from evidence, the jury still would have heard S.T.'s testimony about the events and the phone call during which Khianthalat indicated S.T. could say that her previous statements were not true.  Khianthalat has not established that the State committed a *Brady* violation for the reasons asserted in Ground Two, Subclaim A.

## Subclaim B

Khianthalat argues that the State failed to disclose "[t]he conversation of the alleged victim with the man."  (Dkt. 11, p. 10.)  He claims that when S.T. contacted the State Attorney's Office in an attempt to drop the charges, she talked to a man who told her that she would face prosecution if she withdrew the accusations.  Khianthalat states that this information became apparent through a recorded call he made to S.T. from the Polk County Jail.  The call reflects that S.T. told Khianthalat she tried to talk to someone about not pursuing charges but that she was informed she could get into trouble if she changed her statements.  (Dkt. 18, Ex. 2, pp. 197-98, 205-06.)

Khianthalat does not establish that the State withheld information.  He does not allege that the defense was not provided with this recording.  Nor does he show he was unable to ascertain the allegedly suppressed information, as he participated in the conversation with S.T.  Additionally, the record demonstrates that the defense was aware

that S.T. believed she could be punished for recanting her statements.   Counsel questioned

S.T. about this during cross-examination, and repeatedly asserted in closing arguments

that S.T. was told she would face trouble if she changed her statements.  (*Id.*, pp. 215, 218-

19, 388, 393, 418.)   Because he fails to show that the State withheld exculpatory

information, Khianthalat has not established any *Brady* violation on the basis asserted in

Ground Two, Subclaim B.

**Ground Three: Ineffective Assistance Of Trial Counsel**

Khianthalat alleges ineffective assistance of trial counsel in Ground Three.

Ineffective assistance claims are analyzed under the test set forth in *Strickland v.*

*Washington*, 466 U.S. 668 (1984):

> The law regarding ineffective assistance of counsel claims is well settled and
> well documented.   In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct.
> 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for
> analyzing ineffective assistance of counsel claims.   According to *Strickland*,
> first, the defendant must show that counsel's performance was deficient.  This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment.      Second, the defendant must show that the deficient
> performance prejudiced the defense.  This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).   Demonstrating deficient

performance "requires showing that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

*Strickland*, 466 U.S. at 687.   Deficient performance is established if, "in light of all the

circumstances, the identified acts or omissions [of counsel] were outside the wide range

of professionally competent assistance."    *Id.* at 690.   However, "counsel is strongly

presumed to have rendered adequate assistance and made all significant decisions in the

exercise of reasonable professional judgment." *Id.* Additionally, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Ia.*

Khianthalat must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691-92. To show prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A petitioner cannot meet his burden merely by showing that counsel's choices were unsuccessful:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (en banc) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Sustaining a claim of ineffective assistance of counsel on federal habeas review is

difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Richter*, 562 U.S. at 105 (citations omitted).  *See also Pinholster*, 563 U.S. at 202 (a petitioner must overcome the "'doubly deferential' standard of *Strickland* and AEDPA.").

If a claim of ineffective assistance of counsel can be resolved through one of the *Strickland* test's two prongs, the other prong need not be considered.  466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").

**Subclaim A**

Khianthalat alleges that trial counsel was ineffective for failing to advise him of the potential deportation consequences if he "preceded [sic] to trial."  (Dkt. 11, p. 12.) Khianthalat states that he received three plea offers from the State but rejected them all. He claims that, under the terms of the final offer, he would have pleaded guilty to an unspecified "lesser charge" and received a sentence of time served and eight years of probation.  (*Id.*)   Khianthalat asserts that, absent counsel's misadvice, he would have entered a plea and thus would not have been subject to deportation.  He alleges "(1) acceptance of the State's offer, would have resulted in an extremely less severe sentence; (2) not face deportation consequences, had it not been for defense counsel's failure to advise; and (3) Petitioner would not have advanced to stand trial."  (*Id.*)

The state court rejected Khianthalat's claim when he raised it in his postconviction motion, finding that he incorrectly asserted he would not have been subjected to

deportation had he entered a plea:

> Subpart (a) alleges trial counsel failed to sufficiently advise Defendant of the consequences and penalties he faced, specifically the potential for deportation. . . . Defendant alleges that had he been properly informed, he would have accepted the State's last plea offer and would not have faced deportation consequences. The Court finds Defendant's argument to be without legal merit, as the law is clear that the entry of a plea by a non-citizen Defendant to a criminal offense subjects the Defendant to the possibility of deportation. Accordingly, claim 3(a) is **DENIED**.

(Dkt. 18, Ex. 15, pp. 86-87.)

Khianthalat does not show that the state court made an unreasonable determination that a conviction may make him eligible for deportation regardless of whether it stemmed from a plea or a trial. Nor does he explain what "lesser charge" he would have pleaded to, or how this would have rendered him ineligible for deportation.

Moreover, although this claim was summarily denied, the advice Khianthalat received with respect to deportation was addressed at the evidentiary hearing. Khianthalat's testimony reflects that "an immigration hold" had been placed on him at the time of the hearing. (Dkt. 18, Ex. 18, p. 143.) Counsel testified that, prior to trial, Khianthalat wanted to volunteer to return to his home country if he could "have all this go away." (*Id.*, pp. 204, 211.) The prosecutor rejected this proposal when counsel presented it. (*Id.*, pp. 212-13.) Counsel testified that Khianthalat was aware he could be deported upon conviction and that she discussed this possibility with him. (*Id.*, pp. 211, 213.) Specifically, she testified that she likely said to him that there existed "a very real possibility" of his deportation unless he was acquitted. (*Id.*, p. 213.)

The court allowed this testimony from counsel in connection with Khianthalat's claim that counsel was ineffective for failing to file a motion to suppress his statement to police.

In rejecting that claim, the state court found counsel's testimony to be credible.  A federal habeas court must defer to factual findings of the state court.  28 U.S.C. § 2254(e)(1). Khianthalat does not overcome the presumption of correctness afforded to the state court's determination that counsel's testimony was credible.  *See Baldwin v. Johnson*, 152 F.3d 1304, 1316 (11th Cir. 1998) ("We must accept the state court's credibility determination and thus credit [the attorney's] testimony over [the petitioner's].");  *Devier v. Zant*, 3 F.3d 1445, 1456 (11th Cir. 1993) ("Findings by the state court concerning historical facts and assessments of witness credibility are . . . entitled to the same presumption accorded findings of fact under 28 U.S.C. § 2254(d).").  *See also Gore v. Sec'y, Dep't of Corr.*, 492 F.3d 1273, 1300 (11th Cir. 2007) ("A certain amount of deference is always given to a trial court's credibility determinations.  That the case is before us on habeas review heightens that deference.") (citations omitted).  Khianthalat does not overcome this presumption of correctness.

The testimony the state court found credible provides that Khianthalat was aware he could be deported upon conviction, and his attorney discussed the likelihood of deportation with him.  Khianthalat does not establish that the state court's rejection of his claim was contrary to or an unreasonable application of *Strickland* or based on an unreasonable determination of the facts.[6]  He is not entitled to relief on Ground Three,

---

[6] Khianthalat's reply raises a distinct claim of ineffective assistance of trial counsel.  Apparently acknowledging that he would have faced deportation if he accepted a plea, Khianthalat alleges that had counsel properly advised him, he would have accepted the plea and "opted to face the [deportation] process from the relative freedom of simple probation as opposed to the harshly restrictive conditions of incarceration." (Dkt. 22, p. 5.)  Khianthalat cannot bring a new claim in his reply.  *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) )("As we repeatedly have admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.'") (citation omitted).  Furthermore, Khianthalat did not present this claim to the postconviction court, and it is based on a different premise than the allegation he did
(continued...)

Subclaim A.

**Subclaims B and C**

In Ground Three, Subclaim B, Khianthalat alleges that counsel was ineffective for not moving to suppress his statement to law enforcement as involuntary and given without proper *Miranda* warnings.[7]  In Ground Three, Subclaim C, Khianthalat argues that trial counsel was ineffective for failing to object to the statement's introduction and thus preserve for appellate review the question of whether his statement was involuntary.  The state court granted an evidentiary hearing on these claims when Khianthalat raised them in his postconviction motion.

Khianthalat testified at the evidentiary hearing that he was not read *Miranda* warnings prior to questioning and that Richburg said his statements could not be used against him in court.  (Dkt. 18, Ex. 18, pp. 144, 145, 151.)  Khianthalat further testified that, during the interview, he tried turning around and going back to work but the detectives told him it would not take long and he would not be arrested that day.  (*Id.*, p. 147.)  He believed he would be arrested if he did not cooperate.  (*Id.*, pp. 147, 150-51.)  However, Khianthalat conceded that he did not have to speak without an attorney, that he was not restrained in handcuffs, and that no one was between him and the door.  (*Id.*, pp. 159, 160.)  While

---

[6](...continued)

raise. (Dkt. 18, Ex. 14, pp. 28-30.)  Therefore, the claim is unexhausted.  Because he cannot return to state court to file an untimely, successive postconviction motion, *see* Fla. R. Crim. P. 3.850(b), (h), the claim is procedurally defaulted.  Khianthalat does not establish the applicability of an exception to overcome the default.  Notwithstanding the default, he does not overcome the presumption of correctness afforded to counsel's evidentiary hearing testimony, in which she stated that Khianthalat was aware he was likely to be deported upon conviction.  Khianthalat cannot obtain relief on the claim presented in his reply.

[7] It does not appear that counsel filed a motion to suppress. On direct appeal, Khianthalat argued that the trial court erred in denying a motion to suppress. (Dkt. 18, Ex. 4, Initial Brief of Appellant, pp. 8-11.) In his reply brief, he conceded that no written motion had been filed and instead asserted that the question of the statement's voluntariness was raised during trial. (Dkt. 18, Ex. 4, Reply Brief of Appellant, p. 4.)

Khianthalat agreed that nobody forced him to say anything, he testified that he said his statements were voluntary at the end of the interview so that he could go back to work (*Id.*, p. 162).  Khianthalat testified that he requested counsel file a motion to suppress several times.  (*Id.*, p. 149.)

Counsel testified that she would have discussed a motion to suppress with Khianthalat.  (*Id.*, p. 194.) She believed no legal basis existed to move to suppress his statements, and stated that she did not file a motion because Khianthalat was free to leave the interview. (*Id.*, pp. 194, 195, 206.)  Counsel was aware that Khianthalat was concerned about his job but denied that Khianthalat told her law enforcement forced him to make statements or told him what to say before they began the tape.  (*Id.*, p. 206.)  She further testified that her discussions with Khianthalat about "feeling threatened during the interview . . . assisted [her]" in deciding not to file a motion to suppress his statement.  (*Id.*, p. 207.)

The state court denied Khianthalat's claims after the evidentiary hearing:

> Defendant alleged counsel was ineffective for failing to file a Motion to Suppress Defendant's statement and for failing to object to the admission of the statement at trial in order to preserve the issue for appellate review. Defendant testified at the hearing that his statement was not voluntarily made because he felt as though if didn't cooperate he would have been arrested. Counsel testified she spoke with Defendant regarding the circumstances of the interview, but did not feel there was a legal basis for the filing of such a motion.  Based on a review of the record and testimony adduced at the hearing, the Court finds the testimony of trial counsel to be more credible. The Court cannot find counsel to be ineffective for failing to file a Motion to Suppress without a good faith basis for such, nor can the Court find counsel ineffective for failing to object to the admission of the statement to preserve such issue for appeal.  Accordingly, the Court finds Defendant has failed to establish the first prong under <u>Strickland</u>, and therefore claims 3b and 3c are **DENIED**.

(Dkt. 18, Ex. 20, p. 231).

The record supports the rejection of Khianthalat's claim.  Initially, the record reflects

that Khianthalat was not in custody when he made his statements to officers.

> A defendant is in custody for the purposes of *Miranda* when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  Whether [a defendant] was in custody prior to his formal arrest depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.  The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant.  Under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person.

*United States v. Barry*, 479 F. App'x 297, 299 (11th Cir. 2012) (quoting *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)).

Khianthalat was interviewed inside a room or office at his place of employment. (Dkt. 18, Ex. 2, pp. 226-27, 251.)  He was not placed under arrest, and was told that he would not be placed under arrest.  (*Id.*, pp. 226-27, 252, 256-57.)   Khianthalat was not physically restrained within the room and he makes no allegation that he was physically unable to leave the room.  (Dkt. 18, Ex. 18, p. 160.)   No one was located between Khianthalat and the door.  (*Id.*)   Detectives informed Khianthalat that he could leave at any time, and he indicated that he understood this. (Dkt. 18, Ex. 2, pp. 227, 252, 257.) Accordingly, Khianthalat fails to show any restraint on his freedom of movement such that a reasonable innocent person would not feel free to leave.[8]

Because Khianthalat was not in custody when he spoke to detectives, *Miranda* warnings were not necessary.  *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) ("We

---

[8] *See, e.g., United States v. Maldonado*, 562 Fed. App'x 859, 862 (11th Cir. 2014) (individual was not in custody when she was told that she was free to leave, was not in custody, and did not have to answer questions; she was interviewed at work;  she was not physically restrained during questioning; her movements were not restricted and she was free to leave; inspectors did not brandish weapons during the interview; and she left voluntarily after the interview and was arrested later).

conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'").

Furthermore, the record supports the conclusion that Khianthalat's statement was voluntary. In determining voluntariness, courts evaluate "the totality of all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Cases in which confessions have been found involuntary "all have contained a substantial element of coercive police conduct." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). "'Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'" *United States v. Thompson*, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (quoting *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir 1992)). *See also Waldrop v. Jones*, 77 F.3d 1308, 1316 (11th Cir. 1996) ("Factors to be considered include the "[accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.'") (quoting *Schneckloth*, 412 U.S. at 226).

The record supports the conclusion that Khianthalat's statement was voluntary. It occurred at his place of employment and, by Khianthalat's own account, was not excessively lengthy. Specifically, Khianthalat testified at the evidentiary hearing that he spoke with detectives for about fifteen to twenty minutes before recording. (Dkt. 18, Ex.

18, p. 148.)  When asked whether the recorded interview lasted for fifteen minutes, he said

he was not sure but did not contest this estimation.  (*Id.*, p. 158.)  Khianthalat was informed

that he could leave at any time and makes no allegation that he was physically prevented

from leaving.   Moreover, Khianthalat agreed on tape that he spoke voluntarily, that

detectives did not threaten or coerce him, and that he was not under the influence.[9]  The

_____

[9] The beginning of the recorded interview contains the following:

DETECTIVE KERCHER: Okay.  We came here to speak to you today in reference to [S.T.], okay?

MR. KHIANTHALAT: Okay.

DETECTIVE KERCHER: And who is [S.T.], related to you?

MR. KHIANTHALAT: She is my ex sister-in-law.

DETECTIVE KERCHER: Okay.  And you realize we're here talking to you - - have we placed you under arrest or told you that you are under arrest?

MR. KHIANTHALAT: No.

DETECTIVE KERCHER: Okay.  You realize you're free to leave at any time, and you don't have to talk to us?

MR. KHIANTHALAT: Yes.

(Dkt. 18, Ex. 2, pp. 256-57.)

At the end of the tape, Kercher and Khianthalat stated:

DETECTIVE KERCHER: Again, we're here at your work today and, like we talked about ahead of time, you knew that you were talking to us voluntarily today; is that correct?

MR. KHIANTHALAT: Yes, sir.

DETECTIVE KERCHER: I told you that you weren't placed under arrest, and you were free to leave.

MR. KHIANTHALAT: Yes.

DETECTIVE KERCHER: Okay.  Has Detective Richburg or I threatened you or coerced you in any kind of way to give you this statement today?

MR. KHIANTHALAT: No, you asked honestly and, I guess, professionally.

(continued...)

transcript of this recording is devoid of any evidence of coercion, force, or threat of force by the detectives.  Khianthalat's allegations of promises and coercion by the detectives in support of his ineffective assistance of counsel claim are vague and unsubstantiated. Furthermore, his claim that the detectives told him the interview would be short when he tried to leave does not reflect that the detectives coerced him into making incriminating statements.

The state court heard testimony from counsel and Khianthalat on his claims of ineffective assistance relating to a motion to suppress.  The state court's factual finding that counsel's testimony was more credible is presumed correct.  *See Baldwin*, 152 F.3d at 1316; *Devier*, 3 F.3d at 1456.  Khianthalat does not overcome the presumption of correctness.  Furthermore, despite his allegation of involuntariness, the record supports the conclusion that counsel had no basis to file a motion to suppress Khianthalat's statement based on a lack of voluntariness or inadequate *Miranda* warnings.  The decision to forego a meritless motion provides no basis to find counsel ineffective.  *See Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) ("Counsel was not ineffective for failing to raise these

---

[9](...continued)
DETECTIVE KERCHER: Are you under the influence of any drugs or alcohol right now?

MR. KHIANTHALAT: No, just last weekend I just drank because my cousin and I - - one of my friends just moved into a house.

DETECTIVE KERCHER: That was last weekend?

MR. KHIANTHALAT: Saturday.

DETECTIVE KERCHER: Okay.  You haven't been drinking today?

MR. KHIANTHALAT: No.

(*Id.*, pp. 270-71.)

issues because they clearly lack merit."). Similarly, counsel cannot be deemed ineffective for failing to preserve for appellate review an issue that is without merit. *See United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) (counsel is not ineffective for failing to argue or preserve a meritless issue). Finally, Khianthalat does not demonstrate prejudice as a result of counsel's actions because he does not show a reasonable probability that the trial court would have granted a motion to suppress.

Khianthalat has not shown that the state court unreasonably applied *Strickland* or unreasonably determined the facts in rejecting his claims. He is not entitled to relief on Ground Three, Subclaims B and C.

**Subclaim D**

Khianthalat argues that trial counsel was ineffective for failing to object to a State discovery violation and request a *Richardson*[10] hearing. He claims that the State failed to disclose that he made statements to detectives before they began recording the interview. The state court summarily denied this claim when Khianthalat raised it in his postconviction motion:

> Defendant alleged that counsel was ineffective for failing to object to a discovery violation and request a <u>Richardson</u> hearing. Specifically, Defendant alleged the State failed to disclose oral statements made by Defendant prior to his recorded interview. At the hearing, Defendant testified that he received a transcript of his recorded statement as part of the discovery from counsel and reviewed it, at least briefly. Counsel testified that within the transcript, there were references to statements made by the Defendant prior to recording. Counsel also testified that Defendant returned the transcript to her with additional notes written on it. The Court cannot find a discovery violation existed because Defendant clearly knew about the pre-

---

[10] *See Richardson v. State*, 246 So.2d 771, 774-75 (Fla. 1971) (a trial court must inquire into circumstances of the State's alleged failure to comply with discovery rules and determine whether any noncompliance prejudiced the defendant).

recorded statements.  Accordingly, claim 3d is **DENIED**.

(Dkt. 18, Ex. 20, p. 231.)  The record supports the denial of this claim.  As the state court

noted, both Khianthalat and counsel testified at the evidentiary hearing that they received

a transcript of Khianthalat's recorded statement prior to trial.  (Dkt. 18, Ex. 18, pp. 163-64,

197.) Specifically, counsel testified that this transcript revealed Khianthalat and police had

"an off-tape conversation."  (197-98.)  Counsel testified at the evidentiary hearing that, as

a result of this transcript, she did not believe the State committed any discovery violation.

(*Id.*, p. 197.)[11]

Similar to his allegation in Ground Two, Subclaim A, *supra*, Khianthalat has not

established that the State failed to disclose that he made statements to law enforcement

prior to detectives recording his interview.  Accordingly, he does not show that counsel was

ineffective for failing to object to a discovery violation on this basis.  Because Khianthalat

fails to establish that the state court unreasonably applied *Strickland* or unreasonably

determined the facts in rejecting his claim, Ground Three Subclaim D warrants no relief.

**Subclaim E**

Khianthalat argues that counsel was ineffective for failing to object when a partially

redacted recording of his statement was played for the jury.  The state court summarily

denied this claim:

> In subpart (e), Defendant alleges ineffective assistance of counsel for
> failing to object to the incomplete recorded statement of Defendant being

---

[11] Portions of the recorded statement played at trial mention a pre-recording discussion between Khianthalat and law enforcement.  Specifically, Kercher asked Khianthalat about an admission, stating, "You had said that, prior to the tape, that you had penis-to-vagina sex with her."  (Dkt. 18, Ex. 2, p. 260.)  When Khianthalat admitted that S.T. performed oral sex on him once, Kercher stated, "Before you had said it was maybe three or four times."  (*Id.*, p. 262.)  Additionally, as addressed in note 12, *supra*, Kercher stated they discussed voluntariness "ahead of time."  (*Id.*, p. 270.)

played before the jury.  However, Defendant fails to allege which portions of his recorded statement were not presented to the jury.  Furthermore, a review of the record indicates that at the hearing prior to the start of the trial, the State was instructed they either had to use all of the Defendant's statement, or none of it.  The State chose to present Defendant's recorded statement in its entirety.  (TT 126).  As it is directly refuted by the record, Defendant's claim 3(e) is denied.

(Dkt. 18, Ex. 15, p. 87.)

The record supports the denial of this claim.  The trial court did not permit the State

to present an edited version of the recording:

THE COURT: [ ] Here we are talking about the completeness of a defendant's statement that the state is using to prove his guilt. . . .

. . .

THE COURT: I thought you were trying to use it?

[THE STATE]: I am, Your Honor.  But that section that is the defendant's words should not come in because, in effect, it's disparaging the victim.

THE COURT: Okay.  Let's not use then any of it.

[THE STATE]: Well, obviously, Your Honor, the state wants to use it, but thinks there are certain provisions that are inappropriate.

THE COURT: No, you can't do that.  You use it all or - - unless the defense is in agreement, you use it all or you don't use any.

[THE STATE]: Okay.  If that's the court's ruling, then that's no problem.  We'll use it all, Your Honor.  That makes it quick and easy.

THE COURT: Okay.

(Dkt. 18, Ex. 2, pp. 125-26.)

Khianthalat does not specify what part of the recording he believes was omitted, nor

does he present any evidence in support of his allegation.  Khianthalat fails to show that,

when the recording was played for the jury, counsel had any basis to object to its

completeness.  Accordingly, he does not demonstrate that the state court unreasonably applied *Strickland* or unreasonably determined the facts in rejecting his claim.  Ground Three, Subclaim E warrants no relief.

**Subclaim F**

Khianthalat alleges that counsel was ineffective for not calling as witnesses his ex-wife, who is S.T.'s older sister, and S.T.'s younger sister.  Khianthalat argues that S.T.'s older sister would have testified that Khianthalat knew details of the allegations only because she confronted him with this information prior to his police interview.  Khianthalat argues that S.T.'s younger sister would have testified that she was present on the dates when the allegations were alleged to have occurred, and that no sexual activity between Khianthalat and S.T. took place. He states S.T.'s younger sister would have testified that the family's policy was for S.T. and S.T.'s younger sister to accompany each other when either one left the family's home.[12]  Khianthalat also claims that she would have testified that S.T.'s only motive for pursuing the allegations was that S.T.'s mother told her she would not obtain her learner's permit if she did not testify against Khianthalat.

The state court conducted an evidentiary hearing on this claim.  Khianthalat testified that he told counsel he wanted these witnesses called. (Dkt. 18, Ex. 18, pp. 154-55.)  On cross-examination, however, he agreed that S.T.'s older sister caught him "French-kissing" S.T. and when asked whether she "didn't take too kindly" to this answered, "I guess not." (*Id.*, p. 165-66.)  Khianthalat did not deny that it was possible S.T.'s older sister kicked him out of the house after this incident.  (*Id.*, p. 165.)

---

[12] It appears that the sexual activity took place at the home of S.T.'s older sister, where Khianthalat continued to live for periods of time after their divorce.

Counsel testified that she investigated potential witnesses, but did not believe these two witnesses would have been helpful. (*Id.*, pp. 198-99.) As to S.T.'s older sister, counsel testified that there were many times when she was not available. (*Id.*, p. 198.) When asked whether she was worried that calling S.T.'s older sister might have resulted in additional charges for Khianthalat,[13] counsel responded, "I had a lot of concerns about calling her. I can't tell you I listed each and every one. They all ran through my head and there's no good reason to call her." (*Id.*, p. 208.) With respect to S.T.'s younger sister, counsel believed that the jury may have heard jail calls between her and Khianthalat relevant to the charge of tampering with a witness. (*Id.*, p. 198-99.) Counsel testified there were particular reasons she did not call either witness and her decision was a "trial tactic." (*Id.*, p. 200, 208.)

The state court denied this claim after the evidentiary hearing:

> Defendant also alleged trial counsel was ineffective for failing to investigate and/or call defense witnesses. Specifically, Defendant referred to [S.T.'s older sister], his ex-wife, and [S.T.'s younger sister], another sister of the victim. Counsel stated she was concerned additional charges would arise if [S.T.'s older sister] testified, as she began a sexual relationship with Defendant and became impregnated with his child at the age of 13. Furthermore, Defendant was charged with witness tampering and therefore counsel did not believe these witnesses would be beneficial to the defense. The court finds that the decision of counsel not to call [S.T.'s older sister] and [S.T.'s younger sister] as witnesses was a strategic decision. *See* Occhicone v. State, 768 So.2d 1037 (Fla. 2000). Accordingly, counsel was not ineffective and claim 3f is **DENIED**.

(Dkt. 18, Ex. 20, p. 231.)

Khianthalat does not establish that these witnesses would have provided helpful

---

[13] The record reflects that Khianthalat began a sexual relationship with S.T.'s older sister when she was a minor and that she became pregnant at thirteen or fourteen years of age.

testimony.  S.T.'s older sister could have testified to information consistent with the State's case and contradictory to Khianthalat's testimony he only gave S.T. one "peck on the cheek." Additionally, even assuming that S.T.'s older sister informed Khianthalat of the details of S.T.'s allegations before he talked to police, Khianthalat's prior knowledge of the allegations does not account for his admitting to sexual activity with S.T.

Although Khianthalat claims that S.T.'s younger sister was present "on the dates" of the alleged acts, S.T. only testified as to one date in particular when sexual activity occurred.  (Dkt. 18, Ex. 2, pp. 173-74.)  S.T. testified that Khianthalat had sex with her on this occasion at about 4:00 a.m. in his bed.  (*Id.*, pp. 175, 177.)  There is no indication from this testimony that S.T.'s younger sister was at the home or would have known of this incident or any of the other incidents that occurred on unspecified dates.  S.T. testified that she would go to Khianthalat's house when she "was either baby-sitting the night before or just coming to stay the night" but made no mention of her younger sister.  (*Id.*, pp. 179-80.)  Testimony about the family's general rules does not mean that S.T.'s younger sister accompanied S.T. every time she left home.  Moreover, counsel testified that she had some concern with calling S.T.'s younger sister due to the witness tampering charge.

Additionally, Khianthalat does not demonstrate prejudice as a result of counsel's failure to call S.T.'s younger sister to testify about S.T.'s possible motive of obtaining a learner's permit if she testified.[14]  Given S.T.'s testimony and recorded statements, and his

---

[14] Khianthalat did not allege in his postconviction motion that S.T.'s younger sister would have testified that S.T. was motivated to testify in order to obtain her learner's permit.  (Dkt. 18, Ex. 14, pp. 37-39.) Therefore, this portion of the claim is unexhausted. *See Anderson v. Harless*, 459 U.S. 4, 6 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts . . . or that somewhat similar state-law claim was made."); *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir. 1992) ("[A] habeas petitioner may not present instances of ineffective assistance of counsel in his federal petition (continued...)

own admissions, Khianthalat does not show a reasonable probability that the outcome of the trial would have been different had counsel called S.T.'s younger sister.

The state court concluded that counsel made a strategic decision not to call either witness.  In analyzing the claim under *Strickland*, the focus is on whether counsel's strategic decision to not call S.T.'s sisters was a reasonable one.  *Putman v. Head*, 268 F.3d 1223 (11th Cir. 2001)  ("Moreover, '[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable.'") (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000)); *Minton v. Sec'y, DOC*, 271 Fed. App'x 916, 918 (11th Cir. 2008) ("The Supreme Court has 'declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'") (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).  Khianthalat does not show that counsel's strategic choice was an unreasonable one.

Additionally, he provides no evidence to show that either potential witness would have testified as he believes.  *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit.  A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnotes omitted).  Consequently, Khianthalat's claim is too speculative to warrant relief.  *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th

---

[14](...continued)
that the state court has not evaluated previously.").  Because Khianthalat cannot return to state court to file an untimely, successive postconviction motion, his claim is procedurally defaulted.  Notwithstanding the default, Khianthalat has failed to establish ineffective assistance of counsel for failing to call S.T.'s younger sister.

Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful.  This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'") (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir.1985)).  *See also Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).[15]

Khianthalat fails to demonstrate that the state court unreasonably applied *Strickland* or unreasonably determined the facts in rejecting his claim.  He is not entitled to relief on Ground Three, Subclaim F.

**Subclaim G**

Khianthalat argues that counsel was ineffective for not filing a motion to dismiss once she learned that the State failed to disclose that some of his statements to law enforcement were not recorded.  The state court summarily denied this claim:

> In claim 3(g), Defendant alleges trial counsel was ineffective for failing to move for a dismissal upon learning of evidence that had not been disclosed by the State.  Defendant alleges "[t]he withheld and/or concealed conversation of Defendant receiving *Miranda* and the promise made to secure the alleged confession was not probed as to its sufficiency, was not disclosed to the defense, and was not produced at trial."  However, the Court finds that the Defendant has not stated sufficient grounds for a Motion to Dismiss and therefore counsel cannot be deemed ineffective for failing to file a meritless motion.  *See* Rule 3.190, Fl. R. Crim. P. (2010).  As such, Defendant's claim 3(g) is **DENIED**.

(Dkt. 18, Ex. 15, p. 87.)

---

[15] To the extent Khianthalat may argue that postconviction counsel was ineffective under *Martinez v. Ryan* __U.S.__, 132 S.Ct. 1309 (2012) for failing to investigate, interview, or call these witnesses at the postconviction evidentiary hearing, he is not entitled to relief.  *Martinez* does not establish a freestanding claim of ineffective assistance of postconviction counsel.  As addressed in Ground Three, Subclaims J and K, *infra*, *Martinez* may apply to overcome a procedural default when postconviction counsel fails to raise a claim of ineffective assistance of trial counsel that was required to be brought in an initial-review collateral proceeding. 132 S.Ct. at 1320.  Moreover, the underlying claim of ineffective assistance of trial counsel for failing to call witnesses is meritless.

The state court determined that Khianthalat failed to present any argument sufficient to sustain a motion to dismiss under Florida's procedural rules.   Deference must be afforded to the state court's interpretation of state laws and rules on federal habeas review. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005) ("The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.") (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)); *Will v. Sec'y, Dep't of Corr.*, 278 Fed. App'x 902, 908 (11th Cir. 2008) ("Although an ineffective-assistance-of-counsel claim is a *federal* constitutional claim, which we consider in light of the clearly established rules of *Strickland*, when 'the validity of the claim that [counsel] failed to assert is clearly a question of *state* law, . . . we must defer to the state's construction of its own law.'") (citing *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)).

Counsel is not ineffective for failing to pursue a meritless claim.  *See Brownlee*, 306 F.3d at 1066.   As the state court has determined that Khianthalat's arguments were insufficient for a motion to dismiss under Florida law, Khianthalat fails to show that counsel was ineffective for not filing such a motion.   He does not demonstrate that the state court unreasonably applied *Strickland* or unreasonably determined the facts in rejecting his claim.

**Subclaim H**

At trial, Khianthalat denied the charges against him.  He asserts that S.T. testified for the State because she feared negative consequences if she did not do so.  In particular, he alleges that S.T. wanted to drop the charges against him but that she was threatened

with prosecution, and that S.T.'s mother would not allow her to obtain her learner's permit if she did not testify.   Khianthalat claims trial counsel was ineffective for failing to adequately cross-examine S.T. concerning these motives for testifying and her credibility.

The state court summarily denied Khianthalat's claim:

> In claim 3(h), Defendant alleges ineffective assistance of counsel based on the failure to sufficiently cross-examine [S.T.] as to her motive for testifying.  Defendant alleges [S.T.'s] sole motive for testifying at the trial was to avoid being prosecuted herself.   A review of the record indicates defense counsel did question [S.T.] regarding her motive.   Specifically, Counsel questioned [S.T.] about her knowledge of what could happen to her if she did not show up to testify against Defendant.   (TT 215, 219).   Counsel also inquired about [S.T.] not wanting charges filed against the Defendant.   (TT 218-219).   As it is directly refuted by the record, claim 3(h) is **DENIED**.

(Dkt. 18, Ex. 15, p. 89.)   Counsel's cross-examination of S.T. includes the following:

Q.   Now you're here today - - you got a subpoena, correct?

A.   Yes, ma'am.

Q.   That directed you had to be here?

A.   Yes, ma'am.

Q.   And I think you indicated on the tape you've been told by a number of people what would happen if you didn't show up?

A.   Yes, ma'am.

. . .

Q.   Okay.  And you had already indicated to the police, I think you said, that you did not want the charges, correct?

A.   Yes, ma'am.

Q.   And at that time you were told, well, you know, if you're lying, you could get in trouble?

A.   Yes, ma'am.

(Dkt. 18, Ex. 2, pp. 215, 218-19.)

The record shows that counsel cross-examined S.T. about potential consequences if she did not testify, and about her desire not to pursue charges against Khianthalat. Counsel referred to the taped phone call, which the jury heard during S.T.'s direct examination.  This recording included the following:

MR. KHIANTHALAT: Look, if this ever may come to trial, all you have to do is just say you made it all up, okay?  Don't - - you're not going to get in trouble.  All they want is your money.

[S.T.]: No, I called the guy.

MR. KHIANTHALAT: Uh-huh.

[S.T.]: Yeah.  I can get in trouble.  I was under oath when I told them that.

MR. KHIANTHALAT: Yeah, but what - - did you ask them what kind of trouble you are going to get into?  You know why - -

[S.T.]: Yeah.  I can face like charges, like with - -

MR. KHIANTHALAT: [S.T.], what did he say?  What's going to - -

[S.T.]: False statement and - -

MR. KHIANTHALAT: No, what - - what's going to happen to you?

[S.T.]: I don't know what's going to happen to me.  All I know is he said I could get charged with false statements.

. . .

MR. KHIANTHALAT: Thank you.  Just go talk to my attorney and ask what kind of trouble you can get into. . . . You understand what I'm trying to get at?

[S.T.]: Yes.

. . .

MR. KHIANTHALAT: So do you understand that [persons at the State Attorney's Office] are going to try to tell you everything that they can to scare

you so that way you won't help me?

[S.T.]: I know, but I've already - - I've talked to so many people and asked them, I said, well, are they trying to scare me or not?  And everyone has told me, no, they are being serious, you know, no matter who tells you what.

MR. KHIANTHALAT: Who are you asking?  You're asking people - -

[S.T.]: You can get in trouble.

(Dkt. 18, Ex. 2, pp. 197-98, 205-06.)

The record further reflects that, during closing argument, counsel repeatedly asserted that S.T. was told she would get in trouble if she changed her statements.  (Dkt. 18, Ex. 2, pp. 388, 393, 418.)   Counsel argued to the jury that S.T. "had motive and an interest" in the case.   (*Id.*, p. 420.)

Khianthalat does not demonstrate that counsel was deficient, or that there is a reasonable probability the outcome of trial would have been different had counsel cross-examined S.T. differently.[16]  He has not met his burden to show that the state court's decision was an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts.   He is not entitled to relief on Ground Three, Subclaim H.

**Subclaim I**

Khianthalat argues that counsel was ineffective for failing to present mitigating evidence at sentencing.  He claims counsel should have called the victim as a witness to testify at sentencing because her status as a "willing participant, initiator, or provoker" of the sexual acts may have resulted in a downward departure sentence.  (Dkt. 11, p. 28.)

---

[16] Khianthalat did not present to the state court his allegation that S.T. was motivated to testify so that she could obtain her learner's permit.  (Dkt. 18, Ex. 14, pp. 37-39.)  Therefore, this aspect of his ineffective assistance claim is unexhausted.  *See Anderson*, 459 U.S. at 6; *Footman*, 978 F.2d at 1211.  Because he cannot now raise this assertion in state court, it is procedurally defaulted.  Notwithstanding the default, Khianthalat fails to establish either prong of *Strickland.*

Khianthalat was initially sentenced in 2005 to a total of 45 years in prison.  In 2009, Khianthalat was resentenced on all counts to a total of 33 years in prison.  Khianthalat does not specify whether he refers to his original sentencing proceeding or resentencing proceeding.  However, the state court clearly interpreted his claim to involve the original sentencing proceeding.  At the evidentiary hearing, trial counsel–who did not represent Khianthalat upon resentencing–was questioned about this claim.  Additionally, S.T. was called on Khianthalat's behalf at his resentencing hearing.

Because it concerns the imposition of a sentence he is no longer serving, this claim is irrelevant to the state court judgment for which Khianthalat is in custody.  *Cf. Ferreira v. Sec'y, Dep't of Corr.*, 494 F.3d 1286, 1288 (11th Cir. 2007) (a judgment pursuant to which a petitioner is in state custody becomes final when both the conviction and sentence the petitioner is serving become final).  Notwithstanding, Khianthalat fails to show entitlement to relief.  The state court denied Khianthalat's claim after an evidentiary hearing:

> Defendant alleged counsel was ineffective for failing to present mitigating evidence at sentencing.  Defendant testified he asked counsel to call the victim to testify that she was the aggressor and a willing participant as mitigation.  However, the Court finds that presenting such testimony would have been in opposition to the theory of defense, reasonable doubt, and would have constituted an admission to sexual activity.  Counsel was also concerned about suggesting to the Court that the underage victim of a Lewd Battery consented to such.  The Court finds Defendant has failed to establish either prong as required under Strickland, and therefore claim 3i is **DENIED**.

(Dkt. 18, Ex. 20, pp. 231-32.)  Khianthalat does not establish that counsel was ineffective for failing to call the minor victim for the purposes he sets forth in his claim.  As he has not established that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying this claim, Khianthalat is not entitled to relief on Claim Three, Subclaim I.

**Subclaims J and K: *Martinez v. Ryan***

In Ground Three, Subclaims J and K, Khianthalat presents claims of ineffective assistance of counsel that he did not raise in state court postconviction proceedings. Claims not presented in state court are unexhausted for purposes of federal habeas review. Khianthalat cannot return to state court to file an untimely, successive postconviction motion. *See* Fla. R. Crim. P. 3.850(b), (h). Therefore, the arguments in Subclaims J and K are procedurally defaulted.

*Martinez v. Ryan*, __U.S.__, 132 S.Ct. 1309 (2012), concerns the availability of the cause and prejudice exception when a petitioner presents a procedurally defaulted claim of ineffective assistance of trial counsel in a federal habeas petition. Typically, ineffective assistance of postconviction counsel does not constitute cause to overcome a procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 752-55 (1991). But *Martinez* recognizes a narrow, equitable exception to this rule:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez*, 132 S.Ct. at 1320.[17] A "substantial" claim of ineffective assistance of counsel is one that has "some merit." *Id.* at 1318. *Martinez* provides that the exception is available when a criminal defendant is required to raise ineffective assistance of trial counsel claims in a collateral proceeding, rather than on direct appeal. *Id.* This exception has been

---

[17] Khianthalat filed his postconviction motion *pro se*, but was represented by counsel at the evidentiary hearing. He appears to allege that *Martinez* applies because he was initially *pro se*, or, alternatively, because postconviction counsel was ineffective for not raising the claims of ineffective assistance of trial counsel he now presents in Ground Three, Subclaims J and K. (Dkt. 11, pp. 33, 35.)

extended to situations in which, even if a state's procedures technically permit a defendant to bring a claim of ineffective assistance of trial counsel on direct appeal, "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, __U.S.__, 133 S.Ct. 1911, 1921 (2013).

Even assuming the other circumstances set forth in *Martinez* are met, Khianthalat has not demonstrated that the defaulted claims of ineffective assistance of trial counsel presented in Ground Three, Subclaims J and K are substantial claims with some merit. Thus, he does not overcome the default of these claims by establishing the cause and prejudice exception through *Martinez*.

**Subclaim J**

**Failure To Object To Prosecutorial Misconduct**

Khianthalat claims that trial counsel was ineffective for failing to object to numerous instances of prosecutorial misconduct.  To establish a prosecutorial misconduct claim, Khianthalat must show that the challenged conduct was both improper and prejudicially affected his substantial rights.  *Sexton v. Howard*, 55 F.3d 1557, 1559 (11th Cir. 1995). Habeas relief is available based upon an improper prosecutorial remark only if it is so egregious that the proceeding is rendered fundamentally unfair.  "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  *See also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").  *Darden*, 477

U.S. at 181, further explains:

> The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637 [643] . . . (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.*, at 642 . . . .

*Accord Tucker v. Kemp*, 802 F.2d 1293, 1296 (11th Cir. 1986) (en banc) ("If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair."). A reviewing court must evaluate an allegedly improper comment in the context of both the prosecutor's entire closing argument and the trial as a whole because "[c]laims of prosecutorial misconduct are fact specific inquiries which must be conducted against the backdrop of the entire record." *United States v. Hall*, 47 F.3d 1091, 1098 (11th Cir. 1995). *Accord United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

Most of the alleged prosecutorial misconduct Khianthalat identifies occurred during opening statements or closing arguments. "Opening remarks are not evidence, and the purpose of opening argument is to outline what an attorney expects to be established by the evidence." *Occhicone v. State*, 570 So.2d 902, 904 (Fla. 1990). Closing argument is designed to "assist the jury in analyzing, evaluating and applying the evidence." *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984). While he may not go beyond the evidence presented to the jury, the prosecutor is not limited to a bare recitation of the facts.

The prosecutor may comment on the evidence and express the conclusions he contends the jury should draw from the evidence. *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984). In Florida, "[w]hile wide latitude is permitted in closing argument, *see Breedlove v. State*, 413 So.2d 1, 8 (Fla. 1982), this latitude does not extend to permit improper argument." *Gore v. State*, 719 So.2d 1197, 2000 (Fla. 1998). *See also McArthur v. State*, 801 So.2d 1037, 1040 (Fla. 5th DCA 2001) ("The courts generally allow wide latitude in closing arguments by permitting counsel to advance all legitimate arguments and draw logical inferences from the evidence.").

Additionally, "prosecutorial misconduct may be rendered harmless by curative instructions to the jury." *United States v. Herring*, 955 F.2d 703, 710 (11th Cir. 1992). Prior to both opening statements and closing arguments, the trial court instructed the jury that the attorneys' statements were not evidence. (Dkt. 18, Ex. 2, pp. 136-37, 387.) Jurors are presumed to follow the court's instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001).

**1.** Khianthalat claims that counsel should have objected when, during cross-examination of Khianthalat and closing arguments, the prosecutor addressed a count for which the court granted a judgment of acquittal. Specifically, he alleges that the prosecutor referred to count three, which charged the third instance of vaginal sex, after the court granted a motion for judgment of acquittal on that count. The record refutes Khianthalat's assertion. The court did not grant a judgment of acquittal on count three. (Dkt. 18, Ex. 2, pp. 276-82.) Therefore, Khianthalat fails to present a substantial claim of ineffective assistance of trial counsel for not objecting to the prosecutor's argument or inquiry about this charge on the basis that a judgment of acquittal was granted.

2.     Khianthalat argues that counsel was ineffective for failing to object to the prosecutor's stating his personal opinion on the question of Khianthalat's guilt.  An attorney "must refrain from interjecting personal beliefs into the presentation of his case" because an attorney must "confine arguments to the jury within proper bounds."  *United States v. Young*, 470 U.S. 1, 8-9 (1985).  *See Ruiz v. State*, 743 So.2d 1, 4 (Fla. 1999) ("Except to the extent [an attorney] bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses."); *Sempier v. State*, 907 So.2d 1277, 1278 (Fla. 5th DCA 2005) ("It is . . . improper for a prosecutor to give a personal opinion as to either the justness of the cause or the guilt or innocence of the accused.").   However, "[g]enerally, where there is overwhelming evidence of a defendant's guilt, a prosecutor's assertion that the defendant is guilty may be considered harmless."  *Id.*

**Opening Statements**

Khianthalat asserts that the prosecutor made the following improper comment during opening statements:

> [W]hen all of the evidence is in, and when you follow the law that Judge Kornstein will instruct you upon, there will be one verdict and one verdict only.  And that is to make this man pay for the crimes that he committed against a thirteen-year-old girl.  And I'm convinced when you hear all the evidence, that you will come back with guilty of the charged offenses.

(Dkt. 18, Ex. 2, p. 146.)  Khianthalat fails to demonstrate that this remark amounted to an improper comment relaying the prosecutor's personal opinion of Khianthalat's guilt.  Rather, the comment reflects that the prosecutor expected to present sufficient evidence to demonstrate Khianthalat's guilt and thus obtain a conviction.

**Closing Arguments**

Khianthalat argues that the prosecutor made several improper statements during his closing argument that might have caused the jury to accept "the government's belief in Petitioner's guilt and disregard[ ] their own determinations."  (Dkt. 11, pp. 30-31.)

First, the prosecutor stated that, "The defendant felt like, hey, no one is doing anything about this, so I might as well feel good and have sex with this girl.  And that's what he did."  (Dkt. 18, Ex. 2, p. 401.)   Khianthalat fails to demonstrate that this comment improperly interjected the prosecutor's personal belief.  Nor does he show that the comment was not permissible argument about a conclusion the jury could draw from Khianthalat's recorded statements.  He told detectives that he tried to persuade S.T.'s sister and mother to prevent S.T. from coming to his house, but "nobody was doing anything about us" and he thought, "forget it."[18]

Second, Khianthalat argues that the prosecutor improperly stated his opinion that Khianthalat was telling the truth when he admitted sexual activity with S.T. during his

---

[18] Khianthalat stated to detectives:

I felt weird.  It's just that, I felt like nobody was doing anything about us.  And I was like, forget it.  And I guess that's why I felt like it's - - oh, it was - - I knew it wasn't okay in the beginning.  But it's just - - cause I even told her sister, even when we moved into the house that, you know, that I don't think it's right for her, because it's just, I mean, she didn't come out and say it.  It's just that, you know, just the things that she says and the things that she does, and the things she wears and stuff through the house.  And it's just like a big tease, you know.
        And I tell her sister, you know, I don't think it's a good idea for her, your sister, to come over, and this and that.
        And she was like, why?
        And, I mean, I felt kind of weird, saying, well, you know, she does have a crush on me and everything.
        And she was like, well, you know, she's just a girl and everything.
        And, I mean, I tried to tell her to get her sister, or her mom, to not come over and stuff.  And I guess it didn't - - couldn't happen.

(Dkt. 18, Ex. 2, pp. 265-66.)

interview:

> So, he didn't take responsibility back then.  He doesn't take responsibility
> when he's here in court.  But when he spoke to the police officers, he actually
> was telling them [the] truth.  He didn't say exactly how many times he did
> these things, but he was giving details that only he and [S.T.] would know,
> that the detectives - - the detectives did not supply him with any information.
> He supplied it himself.

(*Id.*, p. 407.)   Khianthalat fails to show that this comment improperly contained the

prosecutor's personal opinion.   The prosecutor pointed out the conflict between

Khianthalat's trial testimony that he did not engage in sexual activity with S.T. and the

admissions he made to police.  His comment further appears to refer to Kercher's testimony

that Khianthalat knew some information about the sexual activity that S.T. did not mention

to detectives.  (*Id.*, p. 342.)  Therefore, a remark that the detailed nature of Khianthalat's

admissions to the sexual encounters indicated the veracity of those admissions concerned

a logical inference the jury could make from the evidence.

Third, Khianthalat alleges the prosecutor made improper comment in stating with

respect to the lewd battery counts, "I'm confident that you will do the only thing that the

evidence and justice demands, and that's to find him guilty as charged."  (*Id.*, p. 409.)

Again, Khianthalat does not demonstrate that the prosecutor improperly provided his

personal opinion in making this comment.  Rather, the prosecutor asserted that the State

presented sufficient evidence to meet its burden of proof.[19]

Khianthalat has not demonstrated any substantial claims of ineffective assistance of

trial counsel for failure to object to the prosecutorial statements identified in Ground Three,

---

[19] Finally, Khianthalat claims that all of the comments identified in Ground Three, Subclaim J(2) were improper in light of the prosecutor and State witnesses referring to S.T. as "the victim."  Khianthalat simply does not demonstrate that calling S.T. "the victim" was improper or rendered the identified prosecutorial statements improper.

Subclaim J(2) on the basis that the prosecutor improperly stated his person opinion of Khianthalat's guilt.

**3.**     Khianthalat argues that counsel was ineffective for not objecting to the prosecutor improperly creating sympathy for the victim and "hostility towards Petitioner." (Dkt. 11, p. 31.)  A prosecutor "may not appeal to the jury's passion or prejudice." *United States v. Rodriguez*, 765 F.2d 1546, 1560 (11th Cir. 1985).  "It is improper for the prosecutor to appeal to the sympathy for the victim where 'the natural effect of which would be hostile emotions toward the accused . . . It is the responsibility of the prosecutor to seek a verdict based on the evidence without indulging in appeals to sympathy, bias, passion, or prejudice.'" *Brinson v. State*, 153 So.3d 972, 979 (Fla. 5th DCA 2015) (quoting *Edwards v. State*, 428 So.2d 357, 359 (Fla. 3d DCA 1983)).  A prosecutor cannot "inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law." *Bertolotti v. State*, 476 So.2d 130 (Fla. 1985).

**Opening Statements**

Khianthalat alleges the prosecutor made improper comments in opening statements to which counsel failed to object.  He asserts that the prosecutor referred to S.T. as a "young kid" and "little girl" and points to the following comment:

> You will hear the cavalier attitude that this grown, mature adult took when he did this to the thirteen-year-old and then she turned fourteen years old, to a young eighth grader. . . . And you will be able to judge for yourself what this twenty-seven-year-old male, at the time of the incident, the attitude he had towards this little girl.

(Dkt. 18, Ex. 2, p. 145.)  Khianthalat also asserts that counsel should have objected to the

prosecutor stating, "The last two charges have to do with this defendant, after violating this young girl, then calling her up on a number of occasions . . ." (*Id.*, p. 146.)

To the extent he merely described S.T. as young or pointed out her age or grade in school at the time of the offenses, Khianthalat fails to show that the prosecutor's description improperly created sympathy for S.T. And even assuming the prosecutor improperly characterized Khianthalat's attitude as "cavalier," or the events as a "violation" of S.T., Khianthalat has not shown that, considered in the context of the entire trial, this rendered the trial fundamentally unfair. *See Tucker*, 802 F.2d at 1296.

**Cross-Examination**

Khianthalat also alleges that the prosecutor "asked Petitioner irrelevant questions about whether he had left his family for months at a time and if he didn't bother to take care of his kids financially (TT.311) to humiliate Petitioner and to create hostility toward him." (Dkt. 11, p. 31.)

The prosecutor asked Khianthalat the following on cross-examination:

Q. You mentioned never wanting to leave your family. Didn't you leave your family sometimes for months on end?

A. Yes, because I was kicked out.

Q. And you didn't bother to take care of your kids financially?

A. Oh, no. I definitely did take care of my kids.

Q. And you didn't  - - you didn't bother to take care of them in the six to ten months that you weren't there, correct?

A. I took care of them financially. I paid the bills, got food in the house, and then [S.T.'s older sister] applied for AFDC without me knowing. And then that's how she got some of the groceries, and when money was low, and she

>was like, well, I need diapers for [a child].  And, I'm like, all right.  That's when
>I bought all this stuff for her.

(Dkt. 18, Ex. 2, p. 311.)

On direct examination, Khianthalat testified about S.T.'s older sister telling him to leave, and about living elsewhere when she wanted him to return.  (*Id.*, pp. 291-92.) Additionally, Khianthalat testified on direct examination that even when separated from S.T.'s older sister, he came to the house and brought items such as diapers, food, or "whatever she says she doesn't have."  (*Id.*, p. 291.)  The prosecutor's questions thus addressed matters within the scope of direct examination.  Moreover, the prosecutor's questions were posed in light of conflicting testimony of S.T.'s mother that Khianthalat did not always financially support his family.  (*Id.*, p. 159-60.)  Khianthalat does not show that the prosecutor's questions improperly humiliated him or created hostility towards him.

**Closing Argument**

Khianthalat alleges that the prosecutor made three improper comments during closing argument.  The first statement is:

>The victim, [S.T.], was thirteen years old.  She was a young impressionable,
>immature girl, who admittedly had a crush on the defendant.   And the
>defendant used this position of trust within that family that he had known for
>close to a decade, he used that father-figure personality, the brother-sister
>image that he tried to portray on the stand, and he manipulated and used that
>to his advantage for his own sexual gratification.  Nothing else.

(*Id.*, p. 398.)

Khianthalat does not establish that the prosecutor improperly appealed to the jury's sympathy for the victim or created hostility toward Khianthalat.  Evidence presented at trial reflected that S.T. was 13 years old when sexual activity with Khianthalat began, that she

had a crush on him, that Khianthalat was 13 years older than S.T. and knew the family for years when the sexual relationship started, and that Khianthalat described his relationship with S.T. as a type of brother-sister relationship.  (Dkt. 18, Ex. 2, pp. 149, 170, 173, 257, 286.)  Therefore, Khianthalat does not show that the prosecutor's argument that Khianthalat took advantage of his connection to S.T. was anything other than a proper argument about conclusions the jury could make from this evidence.

Second, Khianthalat alleges that counsel should have objected to the following statement:

> Other things you'll hear on that CD . . . He keeps telling her for fifteen minutes, he talks to her like a little school girl.  Listen to his tone of voice.  He's like a father, or like a teacher figure.  And he's talking to her like she's a little girl.

(*Id.*, p. 411.)  Khianthalat does not show that this comment improperly created sympathy for S.T. or hostility towards Khianthalat.   The prosecutor supported his argument that Khianthalat tried to persuade or influence S.T. to commit perjury by referencing the recording itself and the manner in which Khianthalat spoke to S.T.  Therefore, this comment involved the prosecutor's argument regarding conclusions the jury could draw from the evidence.

Third, Khianthalat argues the prosecutor improperly stated:

> Now, [S.T.] was victimized back when she was thirteen years old, and now she's going to be victimized in the courtroom.  Now it's all about, oh, [S.T.] made this up; [S.T.] is trying to get the defendant.

(*Id.*, p. 401.)

Khianthalat testified at trial that he never engaged in sexual activity with S.T., and counsel asserted in her closing argument that S.T. had motivation to testify falsely.  Thus,

to the extent that the prosecutor was merely replying to the defense's closing argument, Khianthalat fails to show that such response was improper.  "A prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." *United States v. Stanley*, 495 Fed. App'x 954, 957 (11th Cir. 2012) (citing *United States v. Sarmiento*, 744 F.2d 755, 765 (11th Cir. 1984)).  This principle is recognized in Florida law.  "Based on notions of fundamental fairness, the doctrine of invited response allows the state to comment on the issues raised by the defendant." *Rivera v. State*, 840 So.2d 284, 288 (Fla. 5th DCA 2003).  "The proper limit of a rebuttal is 'a reply to what has been brought out in the defendant's [closing] argument.'" *Brown v. State*, 18 So.3d 1149, 1151 (Fla. 4th DCA 2009) (quoting *Heddendorf v. Joyce*, 178 So.2d 126, 130 (Fla. 2d DCA 1965)).  Furthermore, otherwise improper prosecutorial comments may be permissible when made in reply to matters raised by the defense. *See United States v. Rodgers*, 981 F.2d 497,  499 (11th Cir. 1993) ("The challenged remarks at closing argument, although probably improper if viewed in isolation, were replies in kind to comments appellant's counsel had made during appellant's opening and closing statements.") (citation omitted).  Khianthalat fails to establish that the prosecutor's comments were not a proper reply to the defense.

Khianthalat has not shown that any of the prosecutor's comments identified in Ground Three, Subclaim J(3) were improper for the reasons alleged.  Furthermore, the court instructed the jury that the verdict "should not be influenced by feelings of prejudice, bias, or sympathy."  (Dkt. 18, Ex. 2, p. 431.)  Accordingly, even assuming the comments were improper, in the context of the entire trial, the comments did not render the trial fundamentally unfair. *See Tucker*, 802 F.2d at 1296.  Khianthalat has not demonstrated a substantial claim of ineffective assistance of trial counsel for failing to object to any of the

prosecutorial statements identified in Ground Three, Subclaim J(3).

**4.**     Khianthalat argues that the prosecutor improperly disparaged the defense theory three times during closing argument.  "'[A] prosecutor may not ridicule a defendant or his theory of defense.'" *Jackson v. State*, 147 So.3d 469, 486 (Fla. 2014) (quoting *Servis v. State*, 855 So.2d 1190, 1194 (Fla. 5th DCA 2003)).  However, "[w]hile a prosecutor may 'not ridicule or otherwise improperly attack the defense's theory of the case,' a prosecutor is permitted to suggest to the jury that 'based on the evidence of the case, they should question the plausibility of the defense's theory.'"  *Davis v. State*, 136 So. 3d 1169, 1203 (Fla. 2014) (quoting *Valentine v. State*, 98 So.3d 44, 55-56 (Fla. 2012)).

Defense counsel asserted in closing arguments that the State's case was based on a misunderstanding of S.T.'s crush on Khianthalat and one incident in which Khianthalat gave S.T. a "peck on the cheek."  (Dkt. 18, Ex. 2, p. 387.)  She argued that S.T. was "pushed" into making allegations against Khianthalat and was told she would "get in trouble" if she changed her statements.  (*Id.*, p. 388, 393.)  Counsel also argued to the jury that detectives gave Khianthalat details of the allegations before recording his statement, and that he admitted to the allegations because he "was told he would be free to leave once he gave them a statement.  And, as he told you, he told them what they wanted to hear so he could get back to work."  (*Id.*, p. 390.)

Khianthalat claims counsel was ineffective for not objecting to the prosecutor saying he "had to laugh" at the defense theory and calling Khianthalat's testimony "ludicrous" and "preposterous."  Specifically, during his closing argument, the prosecutor stated, "Now, I've got to laugh when I hear that it was a big misunderstanding about a peck on the cheek."  (*Id.*, p. 397.)  He also said:

> This defendant asks you to believe that he would have admitted that he would have committed a murder so that he could get back to work.  I asked him, I said, "and, sir, if the police would have told you to admit to committing a murder, would you admit to it?"
>
> He said, "oh, absolutely, I wanted to get back to work."  That makes no sense - - not inside the courtroom, not on the street, not in everyday life.  It's ludicrous, based upon the evidence.

(*Id.*, p. 400.)  Finally, the prosecutor stated:

> The second time happened in the same time period, after the February 11th date.  That happened without a condom.  The defendant said it himself.  He admitting to having sex two times without a condom.  And he even said he ejaculated the time that he wore the condom.  But yet he says he made that up.  He made this up.  The police told him what to say, and he told them what they wanted to hear, which is preposterous, based on common sense and the other evidence.

(*Id.*, p. 404.)

Khianthalat does not establish that the prosecutor improperly ridiculed the defense theory through any of these comments.  In his first statement, the prosecutor argued to the jury that they should not credit the defense theory because it was illogical.  Similarly, in his second and third comments, the prosecutor argued that Khianthalat's testimony that he admitted to the offenses in detail simply to tell detectives what they "wanted to hear" and return to work was implausible.[20]  Khianthalat put his credibility at issue by testifying, and

---

[20]The prosecutor's second comment referred to the following portion of Khianthalat's cross-examination:

Q. (By [State]) Sir, is it your testimony today that you told the police all these things because they told you to tell them that?  Is that what you are telling this jury today?

A. That's what they wanted to hear.

Q. Would you have told the jury that you committed a murder, if that's what they wanted to hear?

A. If that's what they wanted to hear.

(continued...)

he does not show that the prosecutor acted improperly in challenging his credibility and the plausibility of his defense.  Additionally, the prosecutor directly replied to the theory of defense set forth in counsel's closing argument, which she began by stating that "this case is about a crush and a misunderstood peck on the cheek."  (Dkt. 18, Ex. 2, p. 387.)

Finally, even assuming that the prosecutor improperly phrased his arguments by using the language Khianthalat identifies, Khianthalat does not demonstrate that the comments rendered his trial fundamentally unfair when taken in context of the entire trial. *See Tucker*, 802 F.2d at 1296.  Thus, Khianthalat does not establish any substantial claim of ineffective assistance of trial counsel for failing to object to these arguments.

**5.**      Khianthalat alleges that the prosecutor improperly stated his personal opinion as to Khianthalat's credibility and vouched for S.T.'s credibility.

> The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility.  This test may be satisfied in two ways.  First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity.  Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony.

---

[20](...continued)
Q.  So you would have told them anything because you were more concerned with getting back to your job, is that what you are telling the jury?

A.  That's exactly what I am telling the jury.

(Dkt. 18, Ex. 2, p. 307.)  Counsel later asked Khianthalat:

Q.  (By [State])  So, sir, you were more concerned with getting back to your job than you were with getting charged with criminal offenses that you claim you are completely innocent of? Is that a fair statement?

A.  Yes.

(*Id.*, p. 323.)

*United States v. Sims*, 719 F.2d 375, 377 (11th Cir. 1983) (citations omitted).

However, a prosecutor is not prohibited from addressing a State witness's lack of

motive to testify untruthfully:

> The prosecutor may not vouch for witnesses but may still 'argue that the fair inference from the facts presented is that a witness had no reason to lie.' The prohibition against vouching does not forbid prosecutors from arguing credibility, which may be central to the case; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury.

*United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991) (citations and quotation

marks omitted).

First, Khianthalat argues that the prosecutor improperly stated during closing

arguments:

> Ladies and gentlemen, listen to the tape.  This man, as he calls himself, is sitting there, cool as a cucumber.  He's calm, cool, collected, nonchalant, matter-of-fact.  He's answering responsively to the detectives.  It's a smooth conversation.  He's not stumbling or thinking, what was I supposed to say?  He doesn't say on the tape, "oh, Detective Kercher, tell me again, what was I supposed to say?"  That's incredible testimony, ladies and gentleman.  It goes completely against common sense.

(Dkt. 18, Ex. 2, p. 399.)  Khianthalat does not show that the prosecutor improperly injected

his personal opinion of Khianthalat's credibility.  Instead, the prosecutor argued that, based

on the content of the recording, it was unreasonable to conclude that Khianthalat could

repeat all of the allegations after simply hearing such information from the detectives.

Second, the prosecutor argued that the State proved the elements of solicitation to

commit perjury in an official proceeding:

> The second element is that, during the solicitation, the defendant commanded, encouraged, or requested [S.T.] to engage in specific conduct which would constitute the commission of perjury in that official proceeding.  And by doing that, she was supposed to make the statement, "I made

it all up," under oath, or words to that effect.  So when it comes down to it, the defendant asked her to get - - if it ever came to trial, to tell them you made it all up, knowing that that would be a lie, because he knows the truth. [S.T.] knows the truth, and they've lived the truth. [S.T.] wanted the truth to come out, and it did.  The defendant wants the truth to stay hidden.

(*Id.*, p. 411.)

Khianthalat does not establish that the prosecutor improperly stated his personal opinion as to Khianthalat's credibility.  Nor does he show that the prosecutor improperly vouched for S.T.'s credibility.   The prosecutor's comment appears to refer to S.T.'s testimony that Khianthalat asked her to tell his attorney that the allegations were not true, but that she never went to the attorney's office and was not willing to lie for Khianthalat. (*Id.*, pp. 212-13.)  Thus, in arguing the State had established the crime of solicitation to commit perjury, the prosecutor asserted that S.T. testified she was asked to lie but refused to do so. He did not improperly use the government's prestige to vouch for S.T.'s credibility. Khianthalat has not established any substantial claims of ineffective assistance of trial counsel in Ground Three, Subclaim J(5).

**6.**    Khianthalat argues that the prosecutor "repeatedly shifted the burden to Petitioner to prove his innocence." (Dkt. 11, p. 32.)   "[P]rosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence."  *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992).  This principle is recognized under Florida law:

The standard for a criminal conviction is not which side is more believable, but whether, taking all the evidence into consideration, the State has proven every essential element of the crime beyond a reasonable doubt.  For that reason, it is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt.

*Gore v. State*, 719 So.2d 1197, 1200 (Fla. 1998).

The first comment is the same remark on page 399 of the trial transcript discussed in Ground Three, Subclaim J(5), *supra*, in which the prosecutor asserted that "[Khianthalat] doesn't say on the tape, 'oh, Detective Kercher, tell me again, what was I supposed to say?'" Khianthalat identifies a second comment by the prosecutor:

> Never one time did you hear the defendant say on that tape, [S.T.], tell them the truth; just tell them the truth. And the reason he didn't say that is because he knows the truth.
> The victim kept saying that she had told the truth and she was afraid to say anything but the truth, and she would continue to tell the truth.

(Dkt. 18, Ex. 2, p. 413.) Third, the prosecutor stated:

> Was there a time your wife caught you kissing or doing something with [S.T.]?
> And then the defendant explains, "Yeah, there was a time." I didn't hear on the tape where the defendant said, oh, but you know what, Detective Kercher, it was all a big misunderstanding. I just simply gave her a peck on the cheek. He doesn't say it in there.

(*Id.*, p. 414.) Khianthalat argues that "[e]ach of these statements were designed to make the jury believe Petitioner had a burden to say certain things and to introduce those things into evidence to prove his innocence." (Dkt. 11, p. 32.) Khianthalat does not show that any of the remarks involved burden shifting or even suggested that Khianthalat was required to prove his innocence. As addressed, the prosecutor's first comment asserted that Khianthalat's testimony that he simply repeated details of the incidents after hearing them from detectives was implausible. The prosecutor's second remark asserted that although Khianthalat testified that he never intended S.T. to lie about the allegations and wanted her to tell the truth about them, he did not communicate to her on the phone call that he wanted to tell the truth. (Dkt. 18, Ex. 2, pp. 304-05.) Thus, this remark involved what the prosecutor

asserted was an inconsistency between Khianthalat's trial testimony and his pre-trial statements.  The third comment noted that Khianthalat's statements to detectives about the kiss that S.T.'s older sister observed were inconsistent with his defense theory.[21]

Khianthalat has not demonstrated that the prosecutor's comments were improper. Moreover, the court instructed the jury that to overcome Khianthalat's presumption of innocence, the State carried the burden to prove each element of the offenses beyond a reasonable doubt, and that Khianthalat was not required to present evidence or prove anything.  (Dkt. 18, Ex. 2, p. 426.)   Accordingly, Khianthalat has not shown that the comments, even if improper, rendered his trial fundamentally unfair.  *Tucker*, 802 F.2d at 1296.   He has not raised any substantial claims of ineffective assistance of trial counsel.

**7.**     Khianthalat argues counsel failed to object when the prosecutor "stated his personal opinion that the comment during a phone conversation by Petitioner to the alleged victim that the reason he was in jail, was because she was a minor, was an admission of guilt." (Dkt. 11, p. 32.)  The prosecutor stated during closing argument:

The - - on the CD, the defendant says, when he's trying to convince [S.T.]

---

[21] Khianthalat discussed this event while speaking to detectives:

DETECTIVE KERCHER: Was there a time that your wife caught you kissing or doing something with [S.T.]?

MR. KHIANTHALAT: Yeah, when we were kissing.  It was one night when I came home from going out with my cousins at Sharkey's, and I was just intoxicated.  And she caught me when I was kissing [S.T.] in my - - in [Khianthalat's son's] bed.

DETECTIVE KERCHER: Okay.  What happened then?

MR. KHIANTHALAT: I just kissed her, and the next thing you know, I looked back and [S.T.'s sister] was right there, and then she punched me. . . . As soon as she made contact with me, I apologized.

(Dkt. 18, Ex. 2, p. 266.)

> that she won't get in trouble, "you won't get in trouble, you're a minor, that's why I am in here."  He is saying, through those words, that he knows that the reason he's sitting in the Polk County Jail is because he had sex with a minor.  He knows that he committed a crime, and he's admitting it to you every which way possible.

(Dkt. 18, Ex. 2, p. 412.)  Khianthalat does not show that the prosecutor made any improper statement during closing arguments.   A portion of the recorded call in which S.T. and Khianthalat discussed whether S.T. could get in trouble for rescinding her statements to law enforcement provides:

> [S.T.]: I don't know what's going to happen to me.  All I know is he said I could get charged with false statements.

> MR. KHIANTHALAT: That's it. [S.T.], you're not even an adult.  That's the reason why I'm in here.  Okay.  The worst thing they're going to do is probably just nothing.  They can't do nothing.

(Dkt. 18, Ex. 2, p. 198.)  The prosecutor's comment involved argument about a logical conclusion the jury could make from the evidence. Khianthalat has not presented a substantial claim of ineffective assistance of counsel for failure to object to this statement.

**Subclaim J: Summary**

Khianthalat has not established that the prosecutor committed misconduct through his questions or comments.   Nor does he show that, even if these statements were improper, they rendered his trial fundamentally unfair.   *Tucker*, 802 F.2d at 1296. Khianthalat has not presented any "substantial" claims "with some merit" alleging ineffective assistance of trial counsel for failure to object to alleged prosecutorial misconduct. Consequently, he fails to establish the applicability of the cause and prejudice exception under *Martinez* to overcome the default of these claims.   Khianthalat does not argue or demonstrate that the fundamental miscarriage of justice exception applies to overcome the

default.  Because he has not shown cause to excuse the default of the arguments presented in Ground Three, Subclaim J, they cannot provide relief.

**Subclaim K**

Khianthalat claims that counsel was ineffective for waiving an objection to inadmissible evidence of prior bad acts.  Khianthalat was divorced from S.T.'s older sister. The record reflects that that relationship began when S.T.'s older sister was a minor, that she became pregnant with Khianthalat's child at either 13 or 14 years of age, and that she married Khianthalat when she was 16 years old.

During testimony of S.T.'s mother, counsel objected to the prosecutor's questions concerning S.T.'s older sister's age and the time frame of the relationship:

> Q:    [S.T.'s older sister], is that your daughter that's not the subject of these charges?
>
> A:    Yes, it is.
>
> Q:    And back in June of 1994, how old was your daughter, [S.T.'s older sister]?
>
> [COUNSEL]: I'm going to object to relevance, Judge.
>
> A:    Thirteen.
>
> [COUNSEL]:        May we approach, please?
>
> THE COURT:        Yes.
>
> (The attorneys approached the bench and the following conference was held out of the hearing of the jurors.)
>
> [COUNSEL]:        That was totally irrelevant, highly prejudicial. What relevance does the age the wife was have to do - - it's tantamount to Williams Rule

evidence.[22]

| | |
|---|---|
| THE COURT: | What is the age of [S.T.'s older sister]? |
| [THE STATE]: | I think she said thirteen or fourteen. |
| THE COURT: | They were married when she was thirteen? |
| [THE STATE]: | That's when she first met him.  That's when [the mother] and her daughter both met him, both of the daughters.   The State's not doing any Williams Rule.  The family connection and the whole context in which this takes place, and how long he's been part of the family - - |
| THE COURT: | Wait a second.   [S.T.'s older sister] is the defendant's former wife? |
| [THE STATE]: | Correct. |
| THE COURT: | How old were they when they got married? |
| [THE STATE]: | Fifteen or sixteen, I think. |
| [COUNSEL]: | They had, I think two kids already before they got married.<br>But if he goes any further along these lines, it would be Williams Rule evidence regarding his and - - being my client's and [S.T.'s older sister's] relationship. |
| [THE STATE]: | As I said, state isn't using this for Williams Rule.  Williams Rule has a purpose.   The state's intention is not to make it a focus or talk about it other than that one question about how old and for how long these - - this family has known the defendant.   And he's been involved with the family since this date.   I don't plan on going anymore in-depth.   I think it goes directly to the family ties and family connections in which this |

---

[22] *Williams* rule evidence is evidence of collateral crimes or acts factually similar to the charged offense that is relevant for a purpose other than showing bad character or propensity, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *See Williams v. State*, 110 So.2d 654 (Fla. 1959).  *See also* § 90.404(2)(a), Fla. Stat.

whole incident took place.

THE COURT:          Yeah, well, I don't see it as Williams Rule.  Its relevance is to show the relationship between him and the family.  It's relevant in the sense that [S.T.] is going to be testifying - -

[COUNSEL]:          I apologize because I may have been premature.  I just want the court and the state on notice that I think he needs to tread carefully here.

THE COURT:          I don't think he - - I am going to prohibit argument as it relates to propensity.  I'm not going to allow that.

[THE STATE]:        Absolutely.

THE COURT:          As an introduction to their relationship in the structure of the family, it's relevant.  I'm going to allow it.

[COUNSEL]:          Okay, Judge.

[THE STATE]:        Thank you, Your Honor.

(The attorneys left the bench.)

THE COURT:          [State], you may continue please.

Q.   (By [State]):          [S.T.'s mother], we were discussing back in June of '94 when you first met the defendant.  You were talking about your daughter [S.T.'s older sister] meeting him; is that correct?

A:   Yes.

Q    And how old was your daughter [S.T.'s older sister] back in June of '94 when she met the defendant?

A    Thirteen.

Q    And at some time after that, did she end up having a relationship with the defendant?

A    Yes, she did.

Q      Okay.  And what type - - did she ever have any children with the defendant?

A      Yes, she had three.

Q      And what are the ages of those three children?

       [COUNSEL]:        Object to relevance, Judge.

       THE COURT:        Sustained.

Q      (By [State]):   Did those three children, did they live with the defendant and your daughter, [S.T.'s older sister]?

A      At different periods of time during their life.

Q      And was there a time when the defendant married your daughter [S.T.'s older sister]?

A      Yes, there was.

Q      And how old was [S.T.'s older sister] when that happened?

A      Sixteen, I believe.

Q      And did she have any kids at that point?

       [COUNSEL]: Object to relevance, Judge.

       THE COURT: When did the defendant and [S.T.'s older sister] get married?

A      In January of '98.

       THE COURT:        What is the question?

       [STATE]:          The question is, when did the first child come into the picture, within the family.

       THE COURT:        Between?

       [STATE]:          Between [S.T.'s older sister] and the defendant.

       THE COURT:        Objection sustained.

Page 63 of  68

(Dkt. 11, Ex. 2, pp. 149-54.)

Khianthalat asserts that counsel was ineffective for waiving the objection to testimony of S.T.'s mother. Khianthalat claims that because "the ages of Petitioner, [S.T.'s older sister], and the alleged victim were elicited during trial, it was known by the jury that [S.T.'s older sister] was a minor and Petitioner was an adult when [S.T.'s older sister] gave birth to Petitioner's two children and Petitioner married [S.T.'s older sister]."  (Dkt. 11, p. 35.) Khianthalat argues that, had counsel raised these points when she objected, "it is likely the court's decision would have been different and the evidence would have been suppressed, or the issue would have been properly preserved" for appeal.  (*Id.*)

Khianthalat does not demonstrate that counsel was ineffective. She did not waive the objection.  Rather, she argued that the prosecutor was attempting to elicit testimony from the witness that would amount to inappropriate *Williams* rule evidence.  The court agreed that the State was prohibited from arguing that any such information was relevant to Khianthalat's propensity.  Furthermore, counsel objected two more times when the prosecutor asked questions that may have revealed S.T.'s older sister had a sexual relationship with Khianthalat when she was a minor.  These objections were sustained.  The jury heard that S.T.'s older sister met Khianthalat at thirteen, married him at sixteen, and had children with him at some point.  But they did not hear that Khianthalat engaged in sexual activity with S.T.'s older sister when she was the same age as S.T. at the time of the offenses for which he was tried.  Khianthalat does not identify any other portion of the record where such information was provided to the jury.  Accordingly, he has not demonstrated any deficient performance by counsel for the reasons alleged.

Khianthalat fails to establish a substantial claim of ineffective assistance of counsel.

Therefore, he does not demonstrate the applicability of the cause and prejudice exception pursuant to *Martinez* to overcome the procedural default of his claim.  Nor does Khianthalat argue or show that the fundamental miscarriage of justice exception applies.  Because Khianthalat cannot overcome the default, Ground Three, Subclaim J provides no relief.

**Ground Four: Trial Court Error**

Khianthalat asserts that the trial court's rejection of his request for a jury instruction on the lesser-included offense of battery amounted to a federal due process violation. Khianthalat appears to acknowledge that his federal due process claim is unexhausted and procedurally defaulted, as he states that "[t]his claim is raised for the first time herein."  (Dkt. 11, p. 38.)[23]

Khianthalat asserts that he meets the cause and prejudice exception to overcome the default on the basis of *Martinez*.  However, *Martinez* does not apply to his claim of trial court error.  Rather, *Martinez* is applicable to claims of ineffective assistance of trial counsel that must be presented in an initial-review collateral proceeding. 132 S.Ct. at 1320.  Accordingly, Khianthalat does not show that the cause and prejudice exception applies to overcome the default of this claim.  He does not argue or allege that fundamental miscarriage of justice exception applies.  Therefore, Ground Four is barred from federal habeas review and cannot provide relief.

**Ground Five: Trial Court Error**

Khianthalat argues that his federal due process rights were violated "when the trial

---

[23]   Khianthalat did not bring any federal claim when he raised this argument on direct appeal in the state appellate court or on discretionary review in the Florida Supreme Court.  (Dkt. 18, Ex. 4, Appellant's Initial Brief, pp. 11-13, Appellant's Reply Brief, p. 5; Ex. 5.)

court upon sentencing misunderstood its discretion to sentence Petitioner to concurrent or rather to consecutive sentences." (Dkt. 11, p. 39.) Khianthalat refers to the portion of the record concerning his original 2005 sentencing proceeding and argues about the consecutive fifteen year sentences that were originally imposed. As addressed in Ground Three, Subclaim I, *supra*, argument concerning Khianthalat's original sentencing proceeding is not relevant because the judgment pursuant to which he is in custody consists of the 2005 conviction and the sentence imposed after a full resentencing proceeding in 2009.

Moreover, his claim raises no federal issue. Although Khianthalat frames the claim in terms of federal due process, his claim involves the state court's application of state sentencing law. Therefore, it is not cognizable in Khianthalat's federal habeas petition. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir.1988) (noting that issues of state law do not provide a basis for federal habeas relief and stating that "[i]n the area of state sentencing guidelines in particular, we consistently have held that federal courts can not review a state's alleged failure to adhere to its own sentencing procedures"). This is true even when a petitioner "couches" his argument in terms of federal law. *See id.* ("This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is 'couched in terms of equal protection and due process.'") (quoting *Willeford v. Estelle*, 538 F.2d 1194, 1198 (5th Cir. 1976)).

Finally, apparently recognizing a procedural default of this claim,[24] Khianthalat raises the fundamental miscarriage of justice exception in his reply. As addressed, this exception

---

[24] Even if the claim was interpreted as raising a federal issue, it is unexhausted due to Khianthalat's failure to raise the federal component of the claim on direct appeal of the 2005 conviction and sentence. (Dkt. 18, Ex. 4, Initial Brief of Appellant, pp. 13-16; Reply Brief of Appellant, pp. 6-8.)

requires a petitioner's "actual" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). Additionally, to be credible, an actual innocence claim "'must be based on reliable evidence not presented at trial.'" *Id.* (quoting *Calderon v. Thompson*, 523 U.S. 538, 559 (1998). However, Khianthalat has not presented any new reliable information showing he is actually innocent of these offenses. Accordingly, he has not established that the fundamental miscarriage of justice exception applies to overcome the default.[25] Ground Five warrants no relief.

Any claims not specifically addressed herein have been found to be without merit.

It is therefore **ORDERED** that Khianthalat's amended petition for writ of habeas corpus (Dkt. 11) is **DENIED**. The Clerk is directed to enter judgment against Khianthalat and to close this case.

It is further **ORDERED** that Khianthalat is not entitled to a certificate of appealability. A petitioner does not have absolute entitlement to appeal a district court's denial of his habeas petition. 28 U.S.C. § 2253(c)(1). A district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Khianthalat "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues

---

[25] Respondent interprets Khianthalat's argument as invoking *Martinez* to raise this claim for the first time. The record reflects that Khianthalat raised this claim of trial court error on appeal, but raised no federal issue. Even assuming that Khianthalat intends to assert that *Martinez* allows him to establish the cause and prejudice exception, as addressed, *Martinez* does not apply to defaulted claims of trial court error. Khianthalat does not establish the cause and prejudice exception.

presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Khianthalat has not made this showing. Finally, because Khianthalat is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

　　　　**ORDERED** in Tampa, Florida, on March 31, 2017.

Charlene Edwards Honeywell
Charlene Edwards Honeywell
United States District Judge

Copy to:
Saysinh P. Khianthalat
Counsel of Record